177 So.2d 795 (1965)
Rita MIRE et al., Plaintiffs-Appellants,
v.
Cecil HAWKINS et al., Defendants-Appellees.
No. 1397.
Court of Appeal of Louisiana, Third Circuit.
May 19, 1965.
Rehearing Denied June 9, 1965.
Writ Granted September 30, 1965.
*797 Simon & Trice, by Phil Trice, Lafayette, for plaintiffs-appellants.
Hargrove, Guyton & Van Hook, by Elmon W. Holmes, Shreveport, Davidson, Meaux, Onebane & Donohoe, by Lawrence E. Donohoe, Jr., Lafayette, J. Lyle DeBellevue, Crowley, Edwards & Edwards, by Edwin W. Edwards, Crowley, P. J. Chappuis, II, Crowley, for defendants-appellees.
Before TATE, SAVOY, and HOOD, JJ.
TATE, Judge.
The plaintiffs appeal from a judgment granting them only part of their demands.
This is a suit by three former minors asserting three different demands, each of them principally against a different set of defendants: (I) against the co-owners of the mineral interests in certain lands ("the Mire tract") formerly owned by their grandparents, the plaintiffs assert a claim for recognition of their own ownership of a portion of the mineral interest affecting the Mire tract; (II) against the mineral lessees under assignments of 1953 mineral leases covering the entire Mire tract, the plaintiffs assert a demand for cancellation of the said leases essentially on the ground of nonpayment of mineral royalties when due (as well as a demand for an accounting for unpaid royalties); and (III) against the State Commissioner of Conservation (as well as the mineral lessees), the plaintiffs assert the unconstitutionality of a commissioner's order reducing the participation of Mire tract acreage in a producing conservation drilling unit.
The trial court granted the plaintiffs judgment recognizing that they still owned a mineral servitude affecting a very small portion of the Mire tract and ordering the defendant mineral lessees to account to plaintiffs for production royalties due to them by reason of such ownership. The plaintiffs' other demands were denied. The plaintiffs alone appeal from the trial court judgment.
Facts.
The late Veon Mire and his wife owned an 152-acre tract in Acadia Parish ("the Mire tract"). There were six children of Veon Mire's marriage, one of whom was the father of the three plaintiffs in this action. As a result, following the death of both of the Mire grandparents and of the plaintiffs' father, the three plaintiffs owned in indivision a one-sixth interest of the Mire tract prior to its partition in 1946.
In 1946, the Mire tract was partitioned into six approximately equal 25-acre lots numbered 1 through 6. The plaintiffs receiving Lot 1 as their share, with a reservation of their one-sixth mineral interest in Lots 2 through 6. In 1947, the plaintiffs sold Lot 1, reserving their remaining one-sixth mineral interest in said lot (the other five-sixths having been reserved by the other Mire co-heirs in the 1946 partition). The plaintiffs were minors at the time of both of these transactions, which were of course court-approved.
In 1953, the mineral leases now held by the defendant lessees were granted on all lots of the Mire tract by all the co-owners of the Mire tract (including the present plaintiffs).
In both the 1946 partition and the 1947 sale, the reservation of the mineral interests, as stated by Horn v. Skelly Oil Co., 224 La. 709, 70 So.2d 657, 660, "constitute[d] a servitude imposed upon the land, giving the owner thereof the right of ingress and egress for the purpose of exploring for and reducing to possession the minerals under the property so burdened." This servitude *798 is extinguished by prescription through nonusage for ten years, in the absence of intervening user or other interruption, or of suspension or other extension of the prescriptive period. Daggett, Louisiana Mineral Rights (Rev. ed., 1949), Sections 12 (p. 53), 14 (p. 63).
These 1946 and 1947 transactions therefore resulted in the then-minor plaintiffs owning two separate mineral servitudes: (a) one created by their reservation in the partition of November 27, 1946 of a one-sixth (1/6) mineral interest in Lots 2 through 6 of the Mire tract; (b) another created by their reservation in the April 11, 1947 sale of a one-sixth (1/6) mineral interest in Lot 1 of the Mire tract.
The most serious questions of this appeal concern whether either or both of these mineral servitudes created in favor of the then-minors were preserved by the interruption or suspension of prescription, or whether instead they had prescribed by the time mineral production was obtained in September, 1957, from a well drilled on non-servitude lands within a compulsory conservation unit which included part of the Mire tract.
I. Questions relating to the plaintiffs' present ownership of a mineral servitude affecting all or part of the Mire tract: Was prescription suspended by their minority or by commissioner's non-drilling orders?
The trial court rejected the plaintiffs' contentions (to be discussed below) that prescription was suspended for the requisite period by either their minority or by non-drilling orders issued by the commissioner of conservation when portions of the Mire tract were unitized. No attempt at user whatsoever being proved within ten years of the creation of the November 1946 servitude, the trial court held that this servitude (affecting Lots 2 through 6) was extinguished by prescription.
As to the April 11, 1957 servitude affecting Lot 1 (only), however, the trial court held that this was preserved as to a small portion of Lot 1 included within a commissioner's drilling unit ("Unit 11"). This holding was based upon the following:
Approximately two acres from the western end of Lot 1 was included in Unit 11, when said compulsory drilling unit was created in 1956. On April 10, 1957, (one day before expiration of the plaintiffs' 1947 servitude), the mineral lessee commenced surface preparations for a unit well within Unit 11, which was successfully completed as a producing well in September, 1957. This drilling site was not on the portion of the Mire tract included within the conservation unit.
Based on the holding in McMurrey v. Gray, 216 La. 904, 45 So.2d 73, to the effect that such surface preparatory operations constitute a user of a mineral servitude (at least if done on the servitude tract), the trial court held that this user on April 10, 1957, interrupted prescription against mineral servitudes affecting all surface acreage unitized within Unit 11, which included two acres of Lot 1 of the Mire tract[1].
The trial court therefore recognized the plaintiffs' mineral ownership to the extent of their one-sixth (1/6) mineral interest in the unitized two acres of Lot 1, pursuant to the mineral servitude created in their favor by the mineral reservation of April 11, 1947, when this lot was sold by them, which servitude was preserved by the user of April 10, 1957.
*799 For the purpose of the succeeding discussion, we will consider that the April 10, 1957 drilling preparations were a user of any mineral servitude affecting surface areas included within the commissioner's Unit 11[2]. This user in April 1957 by unit drilling operations interrupted prescription and preserved the plaintiffs' April 1947 mineral servitude, affecting Lot 1 (only) of the Mire tract, insofar as the two acres of the lot included with Unit 11.
The plaintiffs contend that such April 1957 user also prevented from prescribing their November 29, 1946 servitude, affecting the remainder (Lots 2 through 6) of the Mire tract, insofar as portions of it were included within Unit 11. This result obtains, the plaintiffs say, because the running of prescription had been suspended during part of the ten years so as to prevent this servitude's extinguishment by ten years' non-usage on November 29, 1956, only 4½ months preceding the April 1957 user. The plaintiffs contend that prescription was suspended for a great deal more than 4½ months (a) by their minority during a portion of the ten years and (b) by certain conservation orders prohibiting drilling on portions of the Mire tract within Unit 11, which while effective as obstacles to the user of the servitude had the effect of suspending prescription.
A. Was prescription against the plaintiffs' 1946 mineral servitude suspended by their minority prior to the 1950 amendment of LSA-R.S. 9:5805 abolishing suspension because of minority?
The plaintiffs were minors at the time the mineral servitudes were created in their favor in 1946 and 1947. Under Louisiana Statute, prescription does not run against minors, except as specified by law. LSA-C.C. Arts. 3522, 3554. At the time the plaintiffs' mineral servitudes were created, there was no provision of law by reason of which prescription ran against the mineral servitudes in favor of the then-minor plaintiffs.
In 1950, however, LSA-R.S. 9:5805 was amended to specify that prescription with regard to mineral interests was not suspended or interrupted by reason of minority, with the further specific provision that the abolition of minority as a suspension of prescription was intended to affect presently existing mineral or royalty rights. See Act 510 of 1950, amending and re-enacting LSA-R.S. 9:5805 (which is quoted in full in the discussion below).
The plaintiffs contend that this 1950 statute did not have the retroactive effect of depriving them of the suspension of prescription which had already taken place by reason of their minority prior to the act's effective date in 1950. In this regard, two (Rita and Raymond) of the three plaintiffs became majors either by age or judicial emancipation in the latter part of 1948, while the third (Joseph) did not attain majority until 1953.
Thus, if the plaintiffs' pre-1950 minority suspended the running of prescription against their November 29, 1946 mineral servitude, then prescription did not commence running until 1948 as to two of them (Rita and Raymond) and not until 1950 (the effective date of the act) as to the third (Joseph). If prescription was thus suspended and did not commence running until 1948 and 1950, then the 1957 user (by unit drilling operations) would have interrupted the running of prescription before the 1946 mineral servitude was extinguished by ten years' non-usage.
*800 With regard to the retroactive application of the 1950 enactment, statutes repealing a former cause for the suspension of prescription may be given retroactive application, if so intended; at least so long as a reasonable time is provided for the assertion of any rights adversely affected thereby. Cooper v. Lykes, 218 La. 251, 49 So.2d 3; Thomann v. Dutel, 158 La. 1026, 105 So. 52. In both of the cited decisions, minority had caused a suspension of prescription for several years under a formerly applicable statute; but the new statute abolishing minority as a suspension of prescription was applied retroactively in the light of its intent so as to commence and continue prescription as if such had never been suspended by the formerly applicable statute. Cf.: Sample v. Whitaker, 174 La. 245, 140 So. 36.
The plaintiffs-appellants contend, however, that the 1950 statute must be interpreted as intended to apply prospectively only.
By this 1950 enactment, LSA-R.S. 9:-5805 was amended so as to provide as follows:
"The accrual of the liberative prescription against the ownership, use, or development of minerals, or mineral or royalty rights shall not be suspended or interrupted because of the minority or other legal disability of any owner.
"This Section is intended to and does affect presently existing mineral or royalty rights; however, any minor or other person under legal disability, whose rights are affected hereby, shall have a period of one year from the effective date hereof within which to exercise such rights." (Italics ours.)
Although the matter is not free from doubt, we conclude that this 1950 enactment is under its terms intended to have retroactive effect. It specifically declares that it is intended to affect presently existing mineral rights. Of more weight, if the statute were prospective in operation only (so that prescription would commence running against minors only with its effective date in 1950), then it seems to us that there would have been no need of the statutory provision above italicized additionally providing that persons "whose rights are affected thereby, shall have a period of one year from the effective date hereof within which to exercise such rights."
As to this quoted savings clause: If the effect of the statute was intended to be prospective onlyand thus the abolition of suspension of prescription during minority effective only commencing in 1950 upon enactment of the statute, we can visualize little if any reason for the statute to provide for a period of time within which to assert rights adversely by the ending of the former suspension of prescription. Upon the statutory ending of the previous suspension or prescription, the minor against whom prescription was previously suspended by the former law, would still have the remaining period of the full prescriptive term within which to assert his rights.
On the other hand, if the intent of the statute was indeed retroactively to remove any previous suspension of prescription during minority or legal disability, then there is a definite reason for the statute to contain the one year's savings clause in question. Except for this savings provision, the retroactive application of the statute might in some instances have caused prescription to accrue prior to the effective date of the statute.[3] Therefore, for those who might be adversely affected by the act, without opportunity except for the clause to protect their rights, at least a full year *801 to do so from the effective date was given by the savings clause, so as to avoid questions of the unconstitutional divesting by the statute of property rights or contract obligations if no reasonable time had been allowed for the assertion of rights adversely affected by the act. See Cooper v. Lykes, cited above, at 49 So.2d 5, syllabi 3, 4; Sample v. Whitaker, cited above, at 140 So. 38-39, syllabi VII, VIII.
However, the appellants' able counsel points out that, literally read, the statute only affords a one-year savings period to "any minor or other person under legal disability" adversely affected. Counsel points out that two of the plaintiffs (Rita and Raymond) were no longer minors or under legal disability at the time the statute became effective in 1950, they having attained majority status in 1948. Thus, it is contended, since no savings clause protected the rights of those who had become majors prior to the statute's effective date (and who therefore might be immediately deprived of their rights by previously accrued prescription if the statute were retroactive in effect, see illustration in Footnote 3), it must be assumed that as to such majors, there is no retroactive effect of the statute removing the period of minority suspension applied prior to the statute's effective date. See Nabors, The Mineral Servitude and Royalty Doctrines, Part 2, 26 Tul.L.Rev. 23 (1951), 44-45.
We recognize the force of this argument, and also that the specification in the savings clause of only minors or persons under legal disability might tend to support a prospective rather than retroactive intent of the statute, since majors would have no need of a savings clause if the statute were prospective only. Nevertheless, we are not persuaded by these arguments, however forceful, that the statutewhich for the reasons previously stated we have held was intended by its terms to apply retroactively, should be construed to be prospective in whole or in part.
In the first place, "a statute cannot be retroactive as to some persons and only prospective as to others, unless the Legislature had indicated a manifest intention that it should be so; for the presumption is that a statute is intended to apply alike and equally to all persons unless the contrary clearly appears." Sample v. Whitaker, cited above, at 140 So. 39. Further, "it is a familiar rule of law that, if a statute is capable of two constructions, one of which will save the statute and the other damn it, that construction will be adopted which will save the statute." Id.
As in Sample v. Whittaker, therefore, we think that the statute must be interpreted either as entirely retroactive or else as entirely prospective. Further, we think that it would be an unreasonable construction to hold that the Legislature intended to give minors at the time of the enactment only one year within which to assert their rights or to provide that the statute was retroactive only as to them, but to give greater rights to older persons who had already attained majority status as of the statute's effective date.[4] The plaintiffs' arguments are rejected, therefore, that the 1950 statute should be interpreted so as to apply retroactively to the plaintiffs who were majors as to its effective date.
Further, an applicable principle of construction is to afford a constitutional construction to a statute where possible rather than an unconstitutional one. If the statute is retroactive in effect but majors are not included within the one year's savings *802 clause, then majors at the time of statute's adoption were given no time within which to exercise rights. The statute in some instances (see Footnote 3 illustration above) might immediately upon the statute's effective date deprive them of their right to exercise their servitude, which might thus unconstitutionally not afford them a reasonable period within which to exercise such rights following the statute's enactment. See Cooper v. Lykes, and Sample v. Whitaker, cited above.
We think, therefore, that the savings clause must be reasonably interpreted as providing a year from the act's effective date to exercise rights adversely affected, not only to those who were minors or under legal disability at the statute's effective date, but also to those whose minority or legal disability had formerly suspended prescription, in instances when the former suspension of prescription as to them had retroactively been removed by the 1950 statute.
In our opinion, thus, the sense of the statutory savings clause is that "any [now or former] minor or other person under legal disability * * * shall have a period of one year from the effective date hereof" within which to exercise rights adversely affected by the statute. The bracketed words ("now or former") which we have inserted into the text of the statute are, we believe, implied by the statute's intent both to remove minority as a present or previous cause for the suspension of prescription against mineral rights, but also to permit at least one year from the act's effective date for the exercise of rights adversely affected by it, as to those persons adversely affected by the act's retroactive removal of a former suspension of prescription (under the prior law) because of minority or legal disability.
We are reenforced in this construction of the retroactive effect of the 1950 amendment of LSA-R.S. 9:5805 by the similar interpretation given Act 232 of 1944, LSA-R.S. 9:5805 (prior to the 1950 amendment). This statute abolished the benefit of suspension of prescription in favor of minors or other persons under legal disability insofar as such suspension was formerly allowed co-proprietors with the minors by pre-1944 law. Despite possible arguments that the statute was not retroactive similar to those suggested above, see Nabors above-cited at 26 Tul.L.Rev. 43-44, the Supreme Court indicated that the statute was retroactive in intent and effect insofar as erasing a previous minority-caused suspension of prescription. Cooper v. Lykes, cited above; Davidson v. Bolton, 216 La. 677, 44 So.2d 700.
We therefore agree with the trial court's determination that the plaintiffs' pre-1950 minority did not suspend prescription.
B. Was prescription suspended by obstacles created by the conservation's commissioner's order forbidding drilling? The application or not of Boddie v. Drewett.
As earlier stated, the trial court held that the user of April 1947 did not preserve the plaintiffs' November 1946 servitude because the servitude had been extinguished by prescription some 4½ months earlier. The plaintiffs further contend that there had been a suspension of prescription by periods of some six to seventeen months as to all portions of Mire tract included within Unit 11, because of commissioner's conservation orders preventing drilling during such periods on the Mire tract lands within Unit 11. This contention is based on Boddie v. Drewett, 229 La. 1017, 87 So.2d 516.
Accepting for present purposes the plaintiffs' construction of the commissioner's orders in question, they show the following:
(1) Order 307 issued on May 1, 1955, unitized 45 acres of the Mire tract, with the commissioner's order forbidding drilling on 42 acres of said unitized area (under a prohibition of any drilling less than 1320 feet from the unit boundary). While drilling was therefore permissible on 3 acres of the unitized area, it was thus prohibited *803 on the other 42 acres for some 17 months, until Order 307 was replaced by Order 307-b.
(2) Order 307-b, replacing the prior unitization order, was issued on October 2, 1956. Unit 11 created by it included 61½ acres of the Mire tract (all of the portion previously unitized by Order 307 plus an additional some 16 acres), upon 54 acres of which drilling was prohibited by a similar commissioner's order. The 7½ acres upon which drilling was permissible by the order did not include any part of the three acres upon which drilling had been permitted under Order 307. This prohibition against drilling was in effect from October 2, 1956, some 6½ months prior to the user of April 1957.
Therefore, if the commissioner's orders preventing drilling had the effect as obstacles to user of suspending prescription, all of the unitized 61½ acres of the Mire tract within Unit 11 had been subject at one time or another to such a non-drilling order suspending prescription for from 6 to 17 months. Thus, the user of April 1957 was a user of the November 1946 servitude within the prescriptive period of ten years, taking into account the suspension of prescription through the non-drilling orders.
The plaintiffs' arguement is based solely upon the decision of Boddie v. Drewett, 229 La. 1017, 87 So.2d 516. In this case, the entire (12-acre) servitude tract had been unitized in the commissioner's drilling unit, and the entire servitude tract was subject to a non-drilling order preventing user upon any portion thereof. The Supreme Court held that therefore the commissioner's non-drilling order constituted an obstacle to user of the servitude which therefore suspended prescription for the period of time the obstacle was effective. See LSA-Civil Code Art. 792.
In the present instance, however, there was no obstacle to user by reason of a nondrilling order as to any portion of the 125-acre Mire tract outside of the unitized 61½ acres of Unit 11, Jumonville Pipe & Machinery Co. v. Federal Land Bank, 230 La. 41, 87 So.2d 721 at 724; nor, even if (assuming arguendo) the unitization orders are considered as having divided the servitude,[5] was user by drilling forbidden on at *804 least some of the areas unitized for different periods respectively either by Order 307 (3 of the 45 unitized acres were not subject to a non-drilling order) or subsequently by the superseding Order 307-b (7½ of the 61½ unitized acres were not within the non-drilling area).
Since drilling was thus permissible on at least a part of the servitude area at all times, there was no obstacle to user of the servitude; since "if a definite mineral interest is granted (or reserved) by a single instrument covering the whole of a continuous tract of land only one servitude is created thereby, and the proper exercise of it on any part of the tract interrupts the accruing of prescription as to any and all of the remaining portion." Gulf Oil Corporation v. Clement, 239 La. 144, 118 So.2d 361, 362-363. (Italics ours.) Boddie v. Drewett, upon which appellants rely, is thus distinguishable, since in that case no part of the servitude tract was within an area in which drilling was permissible.
The trial court, therefore, correctly held that the commissioner's limited non-drilling order did not suspend prescription.
II. Demand for cancellation of the leases.
In 1953 plaintiffs executed mineral leases of their interest in the Mire tract. The assignees of these leases eventually achieved production in 1957 by a producing unit well. As against these mineral-lessee defendants, the plaintiffs contend that they are entitled to a cancellation of the lease because of the active breach thereof by the mineral lessees through their failure to pay production royalties to the plaintiffs from the 1957 well prior to this suit in 1960.
The plaintiffs rely upon jurisprudence to the effect that failure to pay production royalties under a mineral lease for any appreciable time, without justification, amounts to an active breach of such lease which entitles the lessor to a cancellation thereof without the necessity of placing the lessee in formal default. Harris v. J. C. Trahan Drilling Contractor, Inc., La.App. 2 Cir., 168 So.2d 881; Sellers v. Continental Oil Co., La.App. 3 Cir., 168 So.2d 435; Pierce v. Atlantic Refining Co., La. App. 3 Cir., 140 So.2d 19, certiorari denied. Under this jurisprudence, however, even where (as here is not the case as to the plaintiffs), there are no adverse claims to the title of the lessor, the mineral-owner lessor is not entitled to cancellation when adequate reason is shown for the delay by the mineral lessee in the payment of production royalties due to the lessor interest. Broadhead v. Pan American Production Co., La.App. 3 Cir., 166 So.2d 329; Fawvor v. United States Oil Co. of Louisiana, Inc., La.App. 3 Cir., 162 So.2d 602.
In the present instance, there was a genuine and bona-fide dispute as to the plaintiffs' ownership of any mineral ownership whatsoever in the Mire tract, which the other co-owners have denied in these proceedings. It was necessary to resolve various serious and unsettled questions of law before it could be determined that the plaintiffs had not lost by prescription any mineral rights they still owned affecting the Mire tract. Under the provisions of the lease, the mineral lessees were authorized to withhold payment of royalties in the event of a dispute as to their ownership. We are cited to no applicable statute or jurisprudence justifying the drastic remedy of cancellation of a mineral lease under such circumstances.
The plaintiffs do contend that by virtue of LSA-R.S. 30:105, 106, the mineral lessees breached an obligation of law to pay their lessors, the plaintiffs, production royalties due under the lease. The *805 statutory provisions in question provide, inter alia, that it is unlawful for mineral lessees to withhold payment of royalties due to the lessor under a mineral lease from "the last record owner." Here, however, it was necessary to resolve several then-unsettled close questions of law before it could be determined whether indeed the plaintiffs were still "record owners" by virtue of their apparently prescribed mineral servitudes, and for this reason among others we do not feel the statute was intended to apply to the type of situation instanced by the present facts.
The trial court properly denied the plaintiffs' demands for cancellation of the leases.
III. Demand to declare commissioner's order unconstitutional.
Commissioner's Order 307-b-1, adopted March 1, 1960, removed some 45 acres of the Mire tract from the conservation Unit 11 created in 1956 by Order 307-b. The new 1960 order thus greatly reduced future participation of the Mire-tract mineral owners in the production royalties from the 1957 unit well. By one of their demands, the plaintiffs attack this 1960 order as unconstitutional on the ground that no adequate prior notice was given to royalty owners adversely affected by it.
The trial court dismissed this demand concerning the constitutionality of the order, for the reason, inter alia, that the commissioner was an indispensable party and that the commissioner had previously been dismissed from the instant action due to lack of proper venue. Mire v. Hawkins, La.App. 3 Cir., 147 So.2d 892, writs denied, 244 La. 116, 150 So.2d 584. We think the trial court's ruling is correct.
When the grounds of a peremptory exception cannot be removed by amendment of the petition, the cause of action must be dismissed. LSA-C.C.P. Art. 934. No adjudication of a cause of action can be made unless all indispensable parties are joined. LSA-C.C.P. Art. 641.
LSA-R.S. 30:12 provides that a person aggrieved by an order of the commissioner of conservation is required to bring an action against him as defendant. Construing the jurisprudence holding that an order of the Louisiana Conservation Commissioner fixing a production unit is not subject to collateral attack, Everett v. Phillips Petroleum Co., 218 La. 835, 51 So.2d 87, Mayer v. Tidewater Oil Co., 218 F.Supp. 611 (D.C.La. 1963), with the foregoing statute, we think that the commissioner is an indispensable party to an action to declare unconstitutional an order issued by him. See LSA-C.C.P. Art. 641: "Indispensable parties to an action are those whose interests in the subject matter are so interrelated, and would be so directly affected by the judgment, that a complete and equitable adjudication of the controversy cannot be made unless they are joined in the action. * * *"
Since there can be no adjudication of a cause of action as to unconstitutionality without joinder of the commissioner as an indispensable party, and since the commissioner cannot be impleaded in the present Acadia Parish suit (and in fact has been dismissed from it by judgment now final), the trial court correctly dismissed the demand as to unconstitutionality of the commissioner's order.
Conclusion.
The judgment of the district court is therefore to be affirmed insofar as it dismissed all demands of the plaintiffs other than those allowed by it, namely, the recognition of part of the mineral servitude claimed by them (that affecting the portion of Lot 1 included within Unit 11), as well as the plaintiffs' right to an accounting for the production of mineral royalties due to them by reason thereof.
*806 Costs.
The district court assessed one-half of the costs in the trial court to the plaintiffs and one-half to the defendants.
The plaintiffs point out that judgment was in their favor for a portion of the mineral interests claimed by them, and for an accounting of the proceeds due them by reason of this, with plaintiffs' legal rights in these regards against all defendants-appellees secured only by reason of such favorable judgment; and that the general rule, subject to the trial court's discretion, however, is that the plaintiff prevailing under these circumstances is entitled to costs. See Official Revision Comment (b), LSA-C.C.P. Art. 1920.
The plaintiffs also point out that the trial court judgment did not fix the fee and tax as costs one expert witness fee due to the plaintiffs' expert engineer for testifying, despite the plaintiffs' request for such fixing (TR 538). The plaintiffs further contend that the cost of preparing the appellate record was materially increased by the necessity of furnishing duplicate copies of voluminous exhibits introduced by the lessee defendants (Continental Oil and Texas Eastern), many pages of which are duplications of exhibits previously entered by the plaintiffs or of other exhibits of the defendants.
Taking all of these circumstances into consideration, and exercising our discretion to assess costs as may be considered equitable by us, LSA-C.C.P. Art. 2164: the defendants-appellees are hereby assessed with all the costs of the trial proceedings (including the expert fee due to the plaintiffs' expert engineer witness, the right being reserved to tax same as costs by a rule to show cause in the trial court, LSA-C.C.P. Art. 1920); further, the mineral-lessee defendants-appellees (Continental Oil and Texas Eastern) are cast with one-half the costs of this appeal, the plaintiffs-appellants with the other one-half.
Decree.
As thus amended as to costs, the trial court judgment is affirmed in all other respects.
Affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.
NOTES
[1] We may say that the lessor defendants-appellees contest the correctness of the trial court's resolution of this previously undecided question of law (when the preparatory operations are conducted not on the servitude tract but on other land unitized with us). However, it is unnecessary for us to discuss the correctness of the trial court's holding with regard to Lot 1. The defendants-appellees neither appealed nor answered the appeal, so the ruling as to Lot 1 is not before us for review.
[2] Of course, under the jurisprudence, this user, on a site within the unit but off the unitized area of the servitude tract, did not constitute a user as to non-unitized servitude lands outside of Unit 11; as to these latter, the plaintiffs' mineral servitudes were therefore extinguished by ten years' non-user. Jumonville Pipe and Machinery Co. v. Federal Land Bank, 230 La. 41, 87 So.2d 721; Childs v. State of Washington, 229 La. 869, 87 So.2d 111; cf., Frey v. Miller, La.App. 3 Cir., 165 So.2d 43.
[3] For example: Persons who as minors acquired a mineral interest in 1938 and became majors in 1948; by the retroactive effect of the 1950 act, the ten years' prescription would have accrued in 1948, instead of then just commencing as under the prior law (because of the prior law's suspension of prescription during minority.)
[4] For instance, in the present instance, the 1946 servitude would prescribe against the only one of the plaintiffs still a minor in 1950, Joseph, in 1956, if the statute were prospective as to him only; whereas it would not prescribe as to the other two plaintiffs, who attained majority status in 1948, until 1958, or two years later than for Joseph, if the statute were retroactive as to minors but not as to majors as of the effective date of the enactment.
[5] It is unnecessary for us to decide whether the commissioner's unitization orders had the effect for present purposes of dividing the servitude between the unitized and the non-unitized areas, although we doubt it. Our Supreme Court in Jumonville Pipe & Machinery Co. v. Federal Land Bank, 230 La. 41, 87 So.2d 721, and Childs v. State of Washington, 229 La. 869, 87 So.2d 111, held that a commissioner's conservation unit did have the effect in law of so dividing a mineral servitude when production from a non-tract well resulted, but this was based solely upon the statutory provision that production from a unit well not located on the servitude tract is "considered" as if it were produced from the servitude tract, LSA-R.S. 30:10(A) (1) (b). See Professor Daggett's discussion at 17 La.L.Rev. 340-342 (1957). The commissioner's unitization order does not divide the servitude for all purposes; for instance, not for mineral lease purposes, see Le Blanc v. Danciger Oil & Ref. Co., 218 La. 463, 49 So.2d 855. Again, for example: in the absence of production bringing into play the statutory provision considering unit production as a servitude user (which perhaps would include surface preparatory and initial drilling operations leading to successful production as the trial court here held, see I above), the general rule is that unsuccessful dry hole drilling in the unit but not on the unitized portion of the servitude tract does not constitute a user of the servitude; see Boddie v. Drewett at 87 So.2d 518: "On the other hand, we do not regard the dry hole drilled on the unit in December of 1949 as a user of the servitude as there was neither production from nor drilling on the land burdened therewith." (To the contrary, of course, unsuccessful bonafide drilling operations located on the servitude tract itself are considered as a user sufficient to interrupt prescription. Daggett, Louisiana Mineral Rights, Rev. ed. 1949. Section 21, p. 96). Unitization per se thus, in the absence of production (statutorily "considered" a user), did not change the usual requirements of user, which permit a user anywhere on the servitude area to constitute a user of the servitude affecting the whole.