186 So.2d 591 (1966)
249 La. 278
Rita MIRE et al.
v.
Cecil HAWKINS et al.
No. 47843.
Supreme Court of Louisiana.
March 28, 1966.
Dissenting Opinion April 1, 1966.
Rehearing Denied June 6, 1966.
*592 Simon, Trice & Mouton, Lafayette, for relators.
Edwin W. Edwards, Phillip J. Chappuis II, J. Lyle DeBellevue, Crowley, Davidson, Meaux, Onebane, & Donohoe, Lafayette, *593 Hargrove, Guyton, Van Hook & Ramey, Shreveport, for defendants-respondents.
Dissenting Opinion of Fournet, C. J., April 1, 1966.
SUMMERS, Justice.
We granted certiorari herein (248 La. 367, 178 So.2d 657) to review the judgment of the Court of Appeal, Third Circuit (177 So.2d 795), limiting the grant to a consideration of whether designation of non-drilling areas, within drilling units created by orders of the Department of Conservation, constitutes an obstacle to the user of a mineral servitude on lands within these non-drilling areas, thereby suspending the liberative prescription running against the mineral servitude.
The pertinent facts are as follows: Veon Mire and his wife Euchariste Savoy had six children. At their death they were survived by four of their children and a number of grandchildren, issue of a predeceased son and daughter named Lines and Lyna Mire. The plaintiffs in this suit, Rita, Raymond and Joseph L. Mire, are three of the grandchildren and the surviving children of Lines Mire.
Among other things, the estate of Veon Mire and his wife consisted of approximately 152 acres of land in Acadia Parish. This land was inherited by the four surviving children and the grandchildren, including plaintiffs.
On November 27, 1946 the heirs partitioned the 152-acre tract. In the act of partition the three plaintiffs, together, were allotted Lot 1 containing approximately 25 acres the remaining acreage being divided into lots numbered 2 to 6 and allotted to the other co-owners. In this partition, plaintiffs reserved an undivided 1/6th interest in the minerals under the entire 152 acres. Later, on April 11, 1947, plaintiffs sold Lot 1 which they had received in the partition and reserved all minerals thereunder, which was, in effect, a reservation of 1/6th of the minerals under this tract, as the other 5/6th mineral interest was vested in the other heirs.
Thus, at this time it should be observed plaintiffs were the owners of a 1/6th mineral interest affecting Lots 2 through 6 on which the liberative prescription of ten years would accrue on November 27, 1956; and they were the owners of a 1/6th mineral interest on Lot 1 on which the liberative prescription of ten years would accrue on April 11, 1957, in the absence of an interruption or suspension.
Then on October 15, 1953 plaintiffs, and all others having an interest in the lands and minerals underlying the 152-acre tract, granted mineral leases to the defendant Cecil Hawkins affecting their interest in the entire tract. In due course, these leases were assigned to defendants Continental Oil Co. and Texas Eastern Transmission Corporation as lessees.
Thereafter, the Department of Conservation, through its Commissioner, by its Order No. 307, effective May 1, 1955, established drilling and developmental units for the Nodosaria "A" Sand of the Rayne Field. One of these units included approximately 45.56 acres of the 152-acre Mire tract, consisting of portions of all six lots of the 1946 partition. This order provided that any well drilled on the units must be at least 1,320 feet from the nearest unit line. This latter proviso placed approximately 42.51 acres of the Mire tract affected by plaintiffs' servitude within the area where drilling was proscribed, leaving a net of about 3.05 acres of the Mire tract within the unit upon which drilling was permissible. No well was ever drilled on this unit.
The situation remained unchanged until the Commissioner issued Order No. 307-b, effective October 1, 1956 dissolving Order No. 307 and creating a new pattern of drilling and developmental units for the Nodosaria "A" Sand. One of these new units included 61.55 acres of the 152-acre Mire tract. These 61.55 acres were comprised of portions of all six lots of the Mire tract. Under the terms of the new order any well drilled on this unit was required to be at least 1,000 feet from any unit line.
*594 The new unit embraced part of, but not all of, the 45.56 acres of the Mire tract which had been included in the unit under the first order (No. 307), together with other portions of the 152-acre Mire tract. Portions of the Mire tract within this latter unit were within 1,000 feet of the unit boundary, but approximately 7.60 acres of the Mire lands were more than 1,000 feet from the unit boundaries. Thus, in this unit approximately 53.95 acres of 61.55 acres attributable to the Mire tract were within the area of the unit where drilling was proscribed, and 7.60 acres were within the area of the unit where drilling was permissible.
On April 10, 1957, more than ten years after the partition wherein plaintiffs reserved the minerals under Lots 2 through 6 of the partition, but within ten years from the reservation of the minerals under Lot No. 1, the defendant Continental Oil Co. began clearing a location for a well on the last unit (307-b). This location was not on any portion of the Mire tract. Though not precise, the evidence indicates that on April 10, 1957 operations for clearing and preparing the well site were commenced, followed by the building of a board road and the digging of pits. The well was spudded in on April 24, 1957 and was completed as a gas producer from the Nodosaria "A" Sand in September 1957. The commercial production of gas from this well commenced on October 12, 1957, and has continued since that time.
Thus, it is clear that the mineral reservation in favor of plaintiffs, affecting Lots 2 through 6 of the Mire tract, is prescribed as no drilling operation took place prior to November 27, 1956 or within ten years from November 27, 1946, the date of the creation of the servitude on those tracts, unless the orders of the Department of Conservation establishing nondrilling areas within the units created an obstacle which suspended the running of the ten-year prescription as to these lots.
Plaintiffs' suit seeks to have their servitude on Lot 1 recognized because of user by timely commencement of drilling operations, and to have the court recognize that an obstacle existed to the exercise of their servitude on Lots 2 through 6 suspending prescription as to that servitude.
The trial court found that as to Lot 1 a timely user took place as there was a good faith commencement of drilling operations prior to the ten-year period evidenced by preparing and clearing the well site on April 10, 1957, which operations ultimately resulted in production. The servitude on Lot 1 was therefore maintained in favor of plaintiffs.
The court also held that no obstacle in legal contemplation existed to the exercise of the mineral servitude belonging to plaintiffs on Lots 2 through 6. Therefore, as no drilling operations (user) took place on those lots the servitude thereon prescribed on November 27, 1956ten years after its creation by the reservation in the partition. The servitude on these lots, therefore, was lost to plaintiffs. The theory of this latter holding was that drilling operations could have been conducted at all times on that portion of the servitude tract within the unit outside the nondrilling area where drilling was permissible (either on the 3.05 acres in Unit 307 or the 7.60 acres in Unit 307-b); and additionally, substantial portions of the servitude tract were located outside the unit upon which drilling operations could have been conducted, and the rights of the servitude owners could have been exercised in that manner.
No appeal was taken as to Lot 1. The decision as to Lots 2 through 6 was affirmed on appeal to the Court of Appeal, Third Circuit.
In their brief and argument before this court plaintiffs contend that, under the opinion in Boddie v. Drewett, 229 La. 1017, 87 So.2d 516 (1956), good faith drilling of a dry hole on any tract in the unit other than the servitude tract is not use of the *595 servitude, and orders of the Commissioner restricting drilling to a certain area in the unit causes an obstacle to user of the servitudes in the nondrilling areas. Thus, it is argued, the order of the Department of Conservation restricting drilling operations in this case created an obstacle to user of the servitude on Lots 2 through 6 such as is contemplated by Article 792 of the Civil Code, which provides:
"If the owner of the estate to whom the servitude is due, is prevented from using it by any obstacle which he can neither prevent nor remove, the prescription of non-usage does not run against him as long as this obstacle remains."
The facts of Boddie v. Drewett indicate that it involved a twelve-acre tract owing a mineral servitude and the twelve-acre tract was included within the nondrilling area of a unit formed by the Department of Conservation. Prior to the expiration of ten years from the date of the creation of the mineral servitude, a well was drilled on the unit but not on the twelve acres. The well was dry. The district court held that drilling in good faith, even though the well was dry, was a user of mineral servitudes within the unit and, therefore, prescription was interrupted.
On appeal to this court the view was expressed that there could be no user of the servitude on the twelve-acre tract by drilling a dry hole in the unit, unless a well was drilled upon the land subject to the mineral servitude. It was considered, however, that user of the mineral servitude would take place when production was had within the unit, prior to the expiration of the ten-year period, even though the well were not on the tract owing the servitude. This opinion was based upon the theory that production within the unit was a user of all mineral servitudes within the unit because extraction of minerals from the unit was an extraction of minerals from every tract in the unit, and this extraction was a user of the servitude even though the well was not located on the servitude tract.
It was then declared that, as the twelve-acre tract was within the nondrilling area, prescription was suspended as to that tract under Article 792 of the Civil Code, as an obstacle existed to the exercise of the servitude thereon so long as the nondrilling order remained in effect or until production occurred within the unit.
The Boddie opinion was signed by three members of the court with four members concurring. After a further study of the opinion in that case we have concluded that it was error to say that prescription was suspended due to the existence of an obstacle. The reason is that this declaration, under the facts, is inconsistent with the objectives, aims and policies of our conservation law. We are of the view that the district judge was correct in holding that the drilling of a dry hole in a good faith effort to obtain production was a user of the mineral servitude on the twelve-acre tract within the nondrilling area of the unit; and, therefore, prescription on the servitude was interrupted.
In the instant case we predicate our opinion upon certain basic principles which we hold to be indisputable.
Article VI, Section 1, of the Louisiana Constitution ordains that the natural resources of the State shall be protected and conserved. It places oil, gas and other mineral resources under a Department of Conservation. R.S. 30:1 et seq., was enacted pursuant thereto. This legislation prohibits waste in connection with the production of oil and gas and defines the power and authority of the Commissioner. The Department of Conservation by this legislation is given the right to create drilling units and to force pool or integrate the privileges of owners of drilling rights therein in order to conserve oil and gas as natural resources and to prevent waste.
*596 When a drilling unit is created and the separate interests therein are force pooled under the Conservation Statute, such as was done by Orders 307 and 307-b herein, the effect is to convert the various separate interests within the unit into a common interest so far as the development of the unit and the drilling of the well are concerned. As stated by Mr. John B. Hussey, former Commissioner of Conservation, Louisiana Department of Conservation, in a criticism of the Boddie case:
"The creation of units is not a complete bar to the drilling but merely specifies the manner in which the drilling must take place, that is, co-operation with others, and the co-operative effort in drilling the well in the manner contemplated by the conservation statute should be an exercise of the mineral servitude of each owner of a drilling right * * * in the manner contemplated by the conservation statute, regardless of where the well is located in the unit and regardless of whether the well results in commercial production or a dry hole." Institute on Mineral Law (5th Annual, 1957), p. 161, La. State University Press, edited by Daggett.
It may be asserted under this theory of the case that the pooling of the mineral servitude belonging to plaintiffs with the designation of an operator for the unit having the right and authority to conduct drilling operations on behalf of all mineral owners within the unit was, in effect, permitting the exercise of the drilling privilege relating to plaintiffs' servitude through a representative, and on lands, designated by law. This is so because the exploration effort of the operator is considered as an effort on behalf of all the interests in the unit; if this effort is successful, the resulting production, to which all tracts contribute, will be distributed to all interests in the proportion which their acreage in the unit bears to the entire acreage. Good faith drilling on any part of the unit should likewise be considered as good faith drilling as to the whole unit and a user of all the servitudes within the unit.
The requirement that the drilling for minerals within a unit be through a designated operator on a designated location, or by a joint cooperative effort on a designated location, may be a departure from the traditional notions of servitude user contemplated by the Civil Code, but the requirement is validly imposed by law in the Conservation Statute and by orders of the Commissioner for a public purpose in the interest of conserving the natural resources of the State. Owners of mineral servitudes, therefore, are charged by law with knowledge of the conservation laws, and it must be concluded in law that they tacitly agreed to acquire their mineral servitudes subject to pre-existing lawful regulations governing their use. It follows from this premise that what these mineral servitude owners urge us to classify as an obstacle is really no obstacle for it does not prevent the use of their servitude, it merely controls the method of user. Any detriment to the mineral servitude owner resulting from regulation of his method of user, such as permitting only one well in a unit and depriving a servitude owner of the right to drill another well on his tract in the unit, is compensated for by the benefits which he derives. Examples are the good faith drilling anywhere within the unit resulting in user interrupting liberative prescription and prolonging the life of his servitude, and the right to a prorata participation in any production from the unit even though the well is not drilled on the servitude tract, benefits which the servitude owner would not receive without the conservation law.
The conservation law and regulations promulgated pursuant thereto also seek to prevent economic waste and waste of the servitude owner's minerals underlying the tract; and they are designed to assure the greatest ultimate recovery from the poolanother advantage to all concerned.
We think this result is more compatible with the unitization concept in our *597 conservation law than the announcement in the Boddie case, and it is a more logical extension of other decisions of this court wherein we recognized that where the drilling of a well on a unit results in commercial production of oil or gas, the production has the effect of extending the primary term of the leases affecting all tracts within the unit and interrupts prescription accruing against any mineral servitude within the unit. Jumonville Pipe and Machinery Co. v. Federal Land Bank of New Orleans, 230 La. 41, 87 So.2d 721 (1956); Le Blanc v. Haynesville Mercantile Co., 230 La. 299, 88 So.2d 377 (1956).
Denying the existence of an obstacle said to result from an order of the Department of Conservation creating nondrilling areas in a unit, as in this case, is consonant with the public policy of this State which does not favor unwarranted extensions of liberative prescription on mineral servitudes; but, to the contrary, that policy favors the timely return of outstanding minerals to the owner of the land.
Also, it should be observed that the Conservation Statute does not contemplate that the Commissioner may only create one drilling unit at a time, rather it contemplates that in many instances the better practice requires that he create a pattern of units for the entire area which "appears to be underlaid" by the reservoir, in order to properly space the wells throughout the reservoir and secure a proper pattern of drainage. (See Hussey, supra.) Under the Boddie opinion obstacles would exist affecting all servitude tracts situated within the non-drilling areas of the units in the entire pattern of units until the nondrilling areas were abolished or until production was obtained within the unit. In some instances this would take years, for all units in a field pattern cannot be drilled at once. The undesirable effect of suspending prescription as to servitudes within the non-drilling areas of the units in the entire drilling pattern until they are either drilled or abolished is obvious.
We hold that there was no obstacle to the exercise of plaintiffs' servitude on Lots 2 through 6, and the servitude in their favor affecting those lands has expired for nonuser.
Accordingly, for the reasons assigned above, though the rationale of our decision differs, the judgment of the Court of Appeal, Third Circuit, is affirmed.
FOURNET, C. J., and McCALEB, J., dissent with written reasons.
HAWTHORNE, Justice (concurring).
I signed the opinion in Boddie v. Drewett, 229 La. 1017, 87 So.2d 516, thereby agreeing with the obstacle theory as set forth by the writer of that opinion. After further study of the issue again presented in the instant case, I have become convinced that the views expressed by the writer of the opinion herein are more consistent with the policy, aims, and purposes of our conservation law. For this reason I concur fully in the views of the majority.
McCALEB, Justice (dissenting).
The main opinion flatly refuses to apply Article 792 of the Civil Code to mineral servitudes when there has been forced unitization, despite the fact that the codal article, by its plain terms, governs the case. In reaching this result it is declared that the decision in Boddie v. Drewett, 229 La. 1017, 87 So.2d 519 (1956) will not be followed because it "* * * is inconsistent with the objectives, aims and policies of our conservation law". To support this view, the majority quotes, as authority, the observations of the late John B. Hussey, former. Commissioner of Conservation, reported in Institute on Mineral Law (5th Annual, 1957), Louisiana State University Press at page 161, to the effect that forced unitization is not a complete bar to drilling as found in the Boddie case, since the forced pooling orders merely constitute a cooperative effort for each owner of a *598 drilling right, whereby the designated operator acts for them regardless of whether his exploration results in production or a dry hole. Adopting, substantially, the hypothesis of Mr. Hussey the instant opinion states that it has solved the problem in this case by applying "certain basic principles which we hold to be indisputable".
I have searched in vain for the indisputable basic principles on which the opinion is said to be predicated and encounter difficulty in discovering that the views therein expressed are consonant with the codal provisions pertaining to predial servitudes and the established jurisprudence which has applied those provisions in mineral cases. Of course, if the unitization provisions of the conservation law are exercised on tracts on which no servitudes or real rights exist, then, the idea of Mr. Hussey that the operator should act as agent for all of the landowners may not be objectionable as no legal disputes are presented in such circumstances. Many legal problems arise, however, when the rights of servitude owners are involved as those rights, by reason of the codal articles on prescription for nonusage, are usually adverse to the rights of the landowner. In these instances, the postulations of Mr. Hussey settle nothing from a legal standpoint for, necessarily, the respective rights of the landowners and servitude owners, inter sese, have little to do with conservation measures and must be adjudged under applicable provisions of the general lawour Civil Code. Determination of these problems have no effect on the operation, aims and policies of the conservation law.
In the absence of a mineral code, it long ago became the lot of this Court to adjudge the nature of mineral rights, and the obligations and advantages flowing from contracts affecting such rights, within the framework of our civil law. In performance of this task, the Court has consistently held that the sale or reservation of minerals creates a real right in the nature of a servitude and during the years has developed and extended the doctrine, by analogy, to those provisions of the Civil Code which relate to real or predial servitudes. In the development of the jurisprudence, the Court has also refused to attribute to this real right in the nature of a servitude characteristics which are essentially those of personal servitudes. See Ohio Oil Co. v. Ferguson, 213 La. 183, 34 So.2d 746 (1947) and other authorities.
The opinion in Boddie v. Drewett simply applied the articles of the Civil Code in resolving that there was actually and factually an obstacle (a lawful order of unitization of the Conservation Commissioner) which effectively prevented the servitude owner from using the servitude and, hence, suspended the running of prescription under the provisions of Article 792 of the Code for the period during which the order was in force. And it was also held, in keeping with the prior jurisprudence on the subject, that there was not a user of the servitude on the 12 acres, forming part of the forced unit there involved, because the dry hole was not drilled on the land covered by the servitude, it being essential under Article 789 that there be good faith drilling on the servitude tract in order to interrupt the running of prescription.
The concept adopted in the main opinion is that, whenever the Conservation Department enters an order unitizing lands, all tracts within the unit on which servitudes or mineral rights exist are relegated to a new status. The drilling operator selected by the Conservation Commissioner becomes, ipso facto, the agent for all mineral owners and the contractual and other legal rights existing between them and the surface owners under our codal law are abrogated except that, if good faith drilling occurs and a dry hole results, the running of prescription as to all mineral rights in lands comprising the unit is interrupted whether or not the particular tract burdened with a real right is located within the drilling area.
It is professed that this view coincides with the public purpose of conserving the natural resources of the State. I find it *599 hard to see how this is sofor the objects, purposes and aims of the conservation laws are not affected in any manner by affording plaintiffs their legal rights under our codal law. Indeed, the only beneficiary of this decision is the landowner, who is given the mineral rights on the land involved prior to the time the mineral owners had lost those rights by nonuser in accordance with the articles of the Civil Code.
It is also stated that denial of the existence of an obstacle resulting from forced unitization is consonant with public policy which does not favor "unwarranted extensions of liberative prescription on mineral servitudes." But why should the existence of a legal obstacle be characterized as "unwarranted"? Our Code provides that obstacles suspend prescription and the jurisprudence has applied this provision to mineral servitudes.
In addition, the opinion rejects application of Article 792 of the Civil Code in cases like this for reasons which to me appear tenuous. The article provides for the suspension of prescription of predial servitudes when the servitude owner is prevented from using it "by any obstacle which he can neither prevent nor remove". The rationale of the majority ruling appears to be that the servitude owner, being cognizant of the conservation laws at the time of his acquisition, tacitly consents to the imposition of the obstacle preventing the servitude's use and, since the appointed operator is the forced legal agent of each owner of a drilling right for the development of the unit, the obstacle is really no obstacle at all. But this cannot be sofor, by denial of the right of use, the servitude owner is being stripped of his contractual rights by the Court.
In truth, the majority statement that, inasmuch as the conservation order constitutes the appointed operator as the forced agent for all there is really no obstacle to use "* * * for it does not prevent the use of their servitude, it merely controls the method of user", reveals the fundamental flaw in the theory, which is actually destructive of the servitude owner's contractual rights and the legal real rights flowing therefrom. For, if the law is construed to require (which it does not) the servitude owner to accept the unit operator as his agent, the result is bound to be that the mineral owner loses his legal right of user while the unit is in existence since he can neither drill himself nor can he require the operator to drill on the unit within any specified time so that the running of prescription will be interrupted, as deduced by the majority view. Thus, the mineral owner is helpless and to say that the unitization order does not impose an obstacle to his user is pure sophistry. I really concede, of course, that when the unit operator drills a well he acts for the benefit of all concerned since all share proportionately in production. But to deduce that the operator is the tacitly appointed drilling agent of the mineral owners is obviously erroneous because those owners are not vested with any right of supervision or control over such alleged agent, particularly insofar as the time (which may be vital to the mineral owner) he will select as proper to conduct good faith operations.
Nor can I subscribe to the view of the Court of Appeal (see 177 So.2d at page 804) that this case is distinguishable from Boddie v. Drewett because, here, drilling was permissible on part of the servitude area at all timesthat is, that three of the 45 unitized servitude acres were not subject to the non-drilling Order 307 and 7½ of the 61½ acres unitized under superseding Order 307-b were not within the non-drilling area.
This deduction is founded on a faulty premise. The unitization orders restricted the drilling operations to one well, which only the operator designated by the Commissioner was authorized to drill. The provisions of the original order, that any well drilled on the units must be at least 1,320 feet from the nearest unit line, and of the supplemental order, that drilling must be at least 1,000 feet from the unit boundary, cannot *600 be regarded as giving plaintiffs the right to drill on any portion of their servitude lying within the unitized area. On the contrary, it was only the operator who was permitted to drill on the unit and the conservation orders that a well must be 1,320 feet or 1,000 feet from the unit boundaries had reference solely to the area designated by the Commissioner, i.e., the area found by the Commissioner from which the minerals could be economically and efficiently extracted from under the lands comprising the unit by a single well.
The orders of the Commissioner were effective obstacles to plaintiffs' user of the servitude and there is no preceptible difference in law or in fact between this case and Boddie v. Drewett.
I respectfully dissent.
FOURNET, Chief Justice (dissenting).
I cannot subscribe to the majority view in this case, for it strikes down the structure in the mineral field this court has built slowly, carefully, and painstakingly over the years since "fugitive" minerals were first discovered in this state, and, because of the lack of any law affecting or classifying them, decreed the sale of mineralsor their reservation when the land is soldwas nothing more than the right or privilege of going upon the land for the purpose of exploring for them and reducing them to possession. This right or privilege was classified as being a real right in the nature of a servitude, and was to be governed by the articles of the Revised Civil Code applicable thereto, one such providing that "A right to servitude is extinguished by the non-usage of the same during ten years." Article 789. But this article is followed by another which declares that if the owner of such servitude "is prevented from using it by any obstacle which he can neither prevent nor remove, the prescription of non-usage does not run against him [the owner] as long as this obstacle remains." Article 792.
Consequently, the right of plaintiffs in this case to an undivided 1/6th of all of the minerals under the 152-acre Mire tract, which they reserved when this tract was partitioned among the heirs of Veon and Euchariste Savoy Mire on November 27, 1946, was prescribed on November 27, 1956,[1] unless the accruing prescription was interrupted in the interim by the user of the servitude, or suspended.
Inasmuch as there was admittedly no production from any portion of the entire 152-acre tract during the 10 years ending November 27, 1956, that would have had the effect of interrupting the running of this prescription, the question presented for our decision here is whether this prescription was interrupted or suspended by the conservation commissioner's Order 307, effective May 1, 1955 (1 year, 6 months, and 26 days prior to November 27, 1956), in which 320-acre spacing units for development of the Nodosaria "A" Sand in the Rayne Field were established, and by his Order 307-b, effective October 1, 1956 (1 month and 26 days prior to the end of the prescriptive period), under which the limits and permissible drilling area of some of these units were revised, constituted obstacles to the plaintiffs' use of that portion *601 of their servitude within the unit[2] under Article 792 of the Revised Civil Code; and, therefore, the development of the unit in 1957, taking into account the suspension period, was within the 10-year period.
The Court of Appeal for the Third Circuit recognized that "if the commissioner's orders preventing drilling had the effect as obstacles to user of suspending prescription, all of the unitized 61½ acres of the Mire tract within Unit 11 has been subject at one time or another to such a non-drilling order suspending prescription for from 6 to 17 months. Thus, the user of April 1957 was a user of the November 1946 servitude within the prescriptive period of ten years, taking into account the suspension of prescription through the non-drilling orders." However, the court held that Boddie v. Drewett, 229 La. 1017, 87 So.2d 516, relied on by plaintiffs, was inapposite, being distinguishable on the ground the entire 12-acre servitude involved in that case lay within the prohibited drilling area of the subject unit, and no well could, therefore, have been drilled thereon; whereas a well could have been located on a portion of the Mire tract within the "permissible drilling area"[3] of Unit 11 under Order 307[4] and Order 307-b,[5] as well as on the acreage in the Mire tract lying outside Unit 11.[6] It concluded, therefore, as had the trial judge,[7] there was no obstacle to the accrual of prescription as to the entirety of plaintiffs' servitude, and prescription was not suspended by virtue of the commissioner's orders.
This holding is clearly not supported by the Louisiana constitution, the conservation statute, the applicable codal articles, the orders of the commissioner, or the jurisprudence. We therefore granted plaintiffs' application for a writ to review this decision, limiting it, however, to a review of the effect of the commissioner's orders on the private property and contractual rights of plaintiffs.
In order that the problem thus posed may be better understood, I have reproduced *602 here a plat of a portion of plaintiffs' Exhibit No. 23, portraying the Mire tract as affected by the composition of the original and revised Unit 11.[8] For a proper understanding 
The Mire tract is the area lying within points 1, 2, 3, 4, 5, and 6.
Plaintiffs acquired Lot 1 under the November 27, 1946, partition of this tract among the Mire co-heirs.
The shaded portion of Block A constitutes the 3.05 acres of the Mire tract that lay within the purported "permissible drilling area" of Unit 11 under the commissioner's order of May 1,1955Order No. 307.
The shaded portion of Block B constitutes the 7.60 acres of the Mire tract within the "permissible drilling area" of Unit 11 under the commissioner's order of October 1, 1956Order No. 307-b.
The only well that could be drilled on Unit 11 as revised in October 1956 is located on Block B, to the left of the portion of the Mire tract within this revised unit. *603 of the approach to and the solution of this problem, I also deem it necessary to review and further analyze the conservation laws of this state from the viewpoint of their limited effect on private property rights.
It has long been established that the state's police power justifies measures for the regulation and production of oil and gas, and for the conservation of these valuable deposits (Ohio Oil Co. v. State of Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L. Ed. 729), but the beginning of legislative control in Louisiana was piecemeal, each law giving recognition to some additional aspect of the importance of the industry to the state. And it is, of course, unquestionable that the wasteful practices of early development brought recognition of the fact that it was in the public interest that maximum recovery of oil and gas be attained, as well as realization of the necessity for a sound public policy with reference to the conservation and production of these commodities. This caused the insertion in the Louisiana Constitution of 1921 of a new clause or section in which the Department of Conservation under the control and direction of a commissioner was created, and the legislature directed to enact laws "necessary to protect, conserve and replenish the natural resources of the State, and to prohibit and prevent the waste or any wasteful use thereof." Section 1 of Article VI. However, all laws adopted pursuant to this constitutional mandate that affect private property rights must be considered in the light of other constitutional provisions protecting these rights, and it is only to the extent that it is necessary to protect, replenish, and conserve the natural resources, or to prevent any waste thereof, that the property rights of individuals must yield to the commissioner's actions under this power. It is on this principle alone that such laws and acts of the commissioner are constitutionally valid.
The legislature, in adopting its comprehensive statute in this field (Act 157 of 1940, now R.S. 30:2-30:20), and aware of the danger of having it declared unconstitutional if it unduly or unjustly impinged on valuable property rights in these resources, or unreasonably restricted the contractual rights of the owners with respect thereto, was careful in fixing the powers and duties of the commissioner to so limit them as to not deprive the owners of their private and contractual rights. Consequently, the power and authority vested in the commissioner under this law is not limited to the conservation of these natural resources and the prevention of their waste. The commissioner is also compelled to protect the rights of all owners that are affected by his actions under the statute. Any order of the commissioner that unnecessarily deprives any owner of his private property rights for a purpose other than the conservation of the natural resources is, therefore, in violation of the Fifth Amendment to the Constitution of the United States and Section 2 of Article I of the Constitution of Louisiana, which clearly provide that private property shall not be taken for public use or purposes unless just and adequate compensation is paid, and, further, in violation of Section 10 of Article I of the Constitution of the United States which prohibits the states from passing any law that impairs the obligation of contracts, and of Section 15 of Article IV of the Constitution of Louisiana, which provides that no law shall be passed "impairing the obligation of contracts," and that "vested rights" cannot be divested, "unless for purposes of public utility, and for just and adequate compensation previously paid." (The emphasis has been supplied.)
To insure that such constitutional rights are not violated, and that the commissioner's actions do not have the effect of depriving individuals of their property and contractual rights in derogation thereof, the legislature specifically provided that the commissioner, once he has determined after due notice and hearing it is necessary to conserve our mineral resources and prevent their waste, is to "establish a drilling unit or units for each pool." Such a unit is "the *604 maximum area which may be efficiently and economically drained by one well," and this is to be drilled "approximately in the center thereof," unless a special exception is granted after notice and hearing. The unit as thus constituted is to be considered as "a developed area as long as a well is located thereon [the unit] which is capable of producing oil and gas in paying quantities." R.S. 30:9 B and C. But, "the owner[9]of a tract of land in the pool, in order that he may obtain the tract's just and equitable share of the production of the pool," cannot be compelled under any order, rule, or regulation of the commissioner, either in its specific "terms or effect," "to drill and operate any well or wells on the tract in addition to the well or wells" authorized as necessary for the proper development of the property. R.S. 30:9A(1) and (2). (The emphasis has been supplied.)
This legislation further provides that "When two or more separately owned tracts of land are embraced within a drilling unit which has been established by the commissioner," the owners may voluntarily "pool their interests and * * * develop their lands as a drilling unit." Where they do not, the commissioner "shall require them to do so." However, all orders requiring such pooling "shall be upon terms and conditions that are just and reasonable and that will afford the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool," the proportionate share of the production allocated to the owner of each tract within the unit being "considered as if it had been produced from his tract by a well drilled thereon." It is only when the parties refuse to pool their interests, and the commissioner is judicially declared to have no authority to compel pooling, that the owner "of each tract embraced within the drilling unit may drill thereon." R.S. 30:10 A(1), (a), (b), and B. (The emphasis has been supplied.)
From the foregoing it is evident that to guarantee the efficient and economical development of a unit without waste, the commissioner's order creates a compulsory joint venture on the part of all those who then have a right to go upon the land for the purpose of reducing the underlying minerals to possession, and the unit thus created is developed for the joint benefit of all whose respective interests are thus pooled to make development of the unit possible.
In the instant case, the commissioner's Order 307 creating Unit 11 in the Rayne Field on May 1, 1955, completely removed from all ownerswhether of the land, servitude, or their lesseesany and all rights then had to go upon any part of this unit for the purpose of reducing the minerals thereunder to possession, clearly erecting an insurmountable obstacle to the exercise of the right of all servitude owners in the unit within the meaning and intendment of Article 792 of the Revised Civil Code, and these rights will remain removed from such owners so long as this order is in effect. Thus, the order clearly deprived the plaintiffs of their right to exercise or use their servitude for the remainder of the 10-year prescriptive period guaranteed to them under the partition contract,[10] i. e., for 1 year, 6 months, and 26 days from May 1, 1955, to November 27, 1956. To also deprive the plaintiffs of their just share of the production from the unit well, as directed by the commissioner's order and R.S. 30:10A(1) (a), is to take from them the just compensation they were guaranteed for *605 relinquishing their right to go upon the land for this full 10 years and secure the minerals themselves. This clearly constitutes an unconstitutional taking of their private property rights for a public purpose without just and adequate compensation.
This court, in all of its decisions, has consistently relegated the effect of the commissioner's orders to the limitation established in the constitution, i. e., to the protection, conservation, and replenishment of "the natural resources of the State, and to prohibit and prevent the waste or any wasteful use thereof;"[11] and it is only for this purpose that private property and contractual rights have been compelled to yield in the public interest.[12] In determining the effect of such orders on the private property and contractual rights subjected to the commissioner's rulings, this court has always, until the decision of the majority in the instant case, taken the view that all orders of the commissioner, to satisfy the constitutional mandate, must follow the legislation passed pursuant thereto, which specifically declares that all such orders must "afford the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool * * *." R.S. 30:10A(1) (a). In other words, at the time an owner's property right is unitized pursuant to the commissioner's order, such owner is guaranteed that when the unit is developed under that order, he will receive his just share of the minerals in the common pool. And this has been held to be so whether the party owned the land, the servitude, or was the lessee of one or both. See, Hood v. Southern Production Co., 206 La. 642, 19 So.2d 336; Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734; Crichton v. Lee, 209 La. 561, 25 So.2d 229; Hunter Co. v. Vaughn, 217 La. 459, 46 So.2d 735; Sohio Petroleum Co. v. V. S. & P. R. R., 222 La. 383, 62 So.2d 615; and Boddie v. Drewett, 229 La. 1017, 87 So.2d 516. (The emphasis has been supplied.)
In the very early decision of Hood v. Southern Production Company, supra, written by the late Chief Justice Charles A. O'Niell, where the effect of Act 157 of 1940 on property and contractual rights of mineral owners was carefully analyzed, this court very aptly observed: "According to the statute and the order itself, the drilling units were established to prevent waste, to avoid the drilling of unnecessary wells and to protect the correlative rights of the owners of mineral interests in the gas field to share ratably in the production of gas from the common reservoir." In rejecting plaintiff's demand to have his mineral lease affecting 100 acres cancelled because of the lessee's failure "to drill offset wells to prevent the draining of gas from the leased premises," the court pointed out that since this acreage had been compulsorily pooled in accordance with Act 157 of 1940, a portion of the tract being placed in a unit in Section 2 and the remaining portion in a unit in Section 3, and the drilling of more *606 than one well on each unit was prohibited, the lessee was "forbidden by the orders of the Department of Conservation" to drill a well as offset on the leased premises. (The emphasis has been supplied.)
Five months later, in Hardy v. Union Producing Company, supra, written by the late Justice Rogers, this court, in rejecting the demand of plaintiffs for cancellation of a mineral lease because of "failure of the lessee to drill a well on the leased premises within the primary term," held that "the right of defendants to drill a well on the 47-acre tract covered by the lease was in effect taken away from them by the orders of the Commissioner of Conservation, with, however, the right reserved to them, as well as to the plaintiffs, to share in the production of the gas produced from the unit in proportion to their ownership." In the course of the opinion the court emphasized that the hands of the defendants "were literally tied as the result of the orders issued by the Commissioner of Conservation," and pointed out that they could, thereafter "do nothing whatsoever to prevent the primary term of the lease from expiring without drilling a well thereon." (The emphasis has been supplied.)
Approximately a year after the Hardy decision, the court, in Crichton v. Lee, supra, with Mr. Justice Hawthorne as the author of the opinion, rejected the demand of servitude owners who had granted a mineral lease and sought its cancellation on the ground "no well had been drilled on the leased premises, nor had any oil or gas been produced therefrom" holding that the order of the commissioner unitizing the Cotton Valley field, and designating the operator who was to develop it, had thereby required the property burdened by the plaintiffs' servitude to be treated as "one lease, one property, and one tract, and all oil, gas, and other hydrocarbons within said area were unitized, and the lands, royalties, and lease interests contained therein were pooled and communized;" consequently, the "plaintiffs could not themselves drill a well on the land * * * because it constitutes a part of the unitized area of the Cotton Valley Field." In support of this holding the Hood and Hardy cases were cited with approval, the latter being quoted from extensively. (The emphasis has been supplied.)
In Hunter v. Vaughn, supra, with the late Justice Moise as the author, this court again rejected the demand of a plaintiff to have a mineral lease cancelled because the lessee had failed to drill a well on the leased premises within the primary term, for the reason that the leased property formed a part of a unit created under the authority vested in the commissioner. In so holding, the order of the commissioner was said to be a "force majeure," i. e., comparable to an act of God. Consequently, the lessee's right "to drill a well on the tract * * * was in effect taken away from them by the Order of the Conservation Commissioner," with reservation to them, however, as well as to the plaintiff, of their right "to share in the production from the unit in proportion to their ownership." (The emphasis has been supplied.)
Following this jurisprudence, when the case of Sohio Petroleum Co. v. V. S. & P. R. R., supra, came to this court for consideration, we denied the demands of servitude and landowners to have their leases covering lots in the town of Delhi, Louisiana, cancelled for failure to drill thereon within a year, or to pay delay rentals in lieu thereof, pointing out that the property had been unitized by the commissioner's order and developed by the drilling of a well, and without specific authorization from the commissioner, "another well could not have been drilled on this same unit." (The emphasis has been supplied.)
And, finally, in Boddie v. Drewett, supra, this court, with Mr. Justice McCaleb as the author, following the articles of the code applicable to servitudes that have, over the years, always been applied in deciding cases involving "fugitive" mineral rights, and upon which the entire structure of our mineral jurisprudence is built, held the commissioner's order unitizing the 12-acre *607 tract burdened by defendants' servitude with other property was an "obstacle" which they could "neither prevent nor remove" within the meaning of Article 792 of the Revised Civil Code; consequently, "the prescription of non-usage does not run against him [the servitude owner] as long as this obstacle remains,"[13] with the result that the unit created by the commissioner's order, in which it was specifically declared drilling on any tract therein constituted drilling on each and every tract and the owners of each tract were to share ratably in the production when the unit was developed, was a use of the servitude within the ten-year prescriptive period, taking into consideration the time during which the accrual of the prescription was suspended by operation of law because of such order. The Hardy and Sohio cases are cited as authority. (The emphasis has been supplied.)
The majority here, in refusing to follow the holding in the Boddie case because it is assertedly "inconsistent with the objectives, aims and policies of our conservation law," and substituting an entirely new concept in the mineral field, allegedly predicated upon "certain basic principles which we hold to be indisputable," has obviously overlooked the rule of law long prevailing in this state to the effect that "The decisions of the highest court of a state, on the subject of * * * mineral rights, establish rules of property; and they should not be reversed even though a contrary rule might be deemed more logical, unless it be by an act of the Legislature." Roberson v. Pioneer Gas Co., 173 La. 313, 137 So. 46, 82 A.L.R. 1264. See, also, Farmer's Heirs v. Fletcher, 11 La.Ann. 142; Cunningham v. Steidman, 133 La. 44, 62 So. 346; Minnesota Mining Co. v. National Mining Co., 3 Wall. 332, 18 L.Ed. 42; Truskett v. Closser, 236 U.S. 223, 35 S.Ct. 385, 59 L.Ed. 549; and Guffey v. Smith, 237 U.S. 101, 35 S.Ct. 526, 59 L.Ed. 856. (The emphasis has been supplied.)
Moreover, the majority has overlooked the long line of jurisprudence that has developed on this subject during the many years, particularly those hereinabove discussed, referring to the case of Boddie v. Drewett only. In fact, the majority opinion reflects a complete departure from this jurisprudence and the basic principles upon which it is predicated without overruling or mentioning it.
I have searched the majority opinion in vain for any sound or logical reason for such a departure from this jurisprudence and the codal articles; for the "certain basic principles" said "to be indisputable" revealing this long line of jurisprudence and particularly the one in Boddie v. Drewettis "inconsistent with the objectives, aims and policies of our conservation law;" and for reasons that in any way support the conclusion reached by the majority, as is very ably demonstrated in the dissenting opinion of Mr. Justice McCaleb. In fact, the constitution, the conservation statute, and the jurisprudence eloquently reveal the majority holding is, itself, "inconsistent with the objectives, aims and policies of our conservation law."
It is true, as the majority opinion points out, that owners acquire mineral servitudes with knowledge their use of them will be subject to "lawful regulations." But the majority overlooks that owners also acquire servitudes with knowledge that under the constitution and conservation statute, as construed and applied in this court, their right to exercise their servitude during the full 10-year period as granted in Article 789 will not be taken away from them unless they are afforded "the opportunity to * * * receive" their "just and equitable share of the oil and gas in the pool'" when the unit is developed. R.S. 30:10A(1) (a). Clearly they could not foresee that this court, in striking down this jurisprudence and deleting R.S. 30:10A(1) (a) from the *608 conservation statute, would exercise prerogatives that, under our triumvirate form of government, lie exclusively within the province of the legislature. (The emphasis has been supplied.)
NOTES
[1] Under the partition of the Mire tract it was divided into 6 lots containing approximately 25 acres each, plaintiffs acquiring Lot 1. Although in selling this lot April 11, 1957, they reserved the minerals thereunder, they, in fact, reserved nothing, as all minerals under the property were then outstanding in a full undivided mineral servitude, plaintiffs being owners of 1/6th of such servitude on the entire 152 acres by reason of the partition, and their co-heirs being owners of the remaining undivided 1/6ths on this entire tract. See, Long-Bell Petroleum Co. v. Tritico, 216 La. 426, 43 So.2d 782, on rehearing. However, since defendants did not appeal from the district court judgment recognizing ownership of a 1/6th interest in the minerals in plaintiffs under this purported second servitude, and did not seek writs from the appellate court judgment affirming the district court in this respect, this phase of the matter is not before us for decision.
[2] According to the experts, the portion of the Mire tract within Unit 11 is the only portion of the entire 152 acres that would be productive.
[3] This conclusion has no basis in fact or in law. It is absurd to say the servitude owner could have drilled, or have had the operator drill, a well on the portion of the Mire tract lying within the so-called "permissible drilling area," for only the operator designated by the commissioner and acting under the commissioner's control could select the site for the only well that could be located anywhere on the unit, including the "permissible drilling area." The commissioner's order, in other words, stopped all mineral development on Unit 11 by anyone other than the operator acting through the commissioner for the public good. And while the exception was under consideration that resulted in the revision of the original Unit 11, not even the operator could drill on this unit.
[4] Some 3.05 acres of the Mire tract lay within this area under Order 307, being the shaded portion of Block A of Unit 11 on the attached plat.
[5] Some 7.60 acres of the tract lay within this area under Order 307-b, being the shaded portion of Block B of Unit 11 on the attached plat.
[6] Under the jurisprudence, the portion of plaintiff's servitude outside the unit was divided from that lying inside for development purposes. The portion inside was then under the control of the commissioner, to be developed as he decreed. If the portion outside was not developed by the servitude owner (or anyone having the right to go upon the land to reduce the minerals to possession) within 10 years, it prescribed. See, Childs v. Washington, 229 La. 869, 87 So.2d 111; and Jumonville Pipe & Mach. Co. v. Fed. Land Bank, 230 La. 41, 87 So.2d 721. The conclusion that drilling on the portion of the tract outside the unit would have interrupted prescription as to the servitude covering the entire 152 acres is, therefore, clearly erroneous.
[7] The trial judge also held that inasmuch as there had been no horizontal unitization of the Rayne Field other than as to the Nodosaria "A" Sand, plaintiffs' servitude could also have been used in other sands throughout the entire 152 acres. However, according to the experts, the Nodosaria "A" Sand was the only productive sand under the tract.
[8] This plat is not to an exact scale, but it is a fair approximation. Information explaining the plat, in so far as pertinent to a decision, is typed beneath it.
[9] "Owner" is defined in the statute as "the person who has the right to drill into and produce from a pool and to appropriate the production either for himself or for others." R.S.30.3(8). (The emphasis has been supplied.)
[10] Indeed, under the majority decision, had the unit been established December 26, 1946, 1 month after the servitude fell to the plaintiffs in the partition proceeding, they would have been deprived of this valuable property without compensation for a period of 9 years and 11 months, despite the guarantees of the contract effecting the partition.
[11] Section 1 of Article VI of the Constitution of 1921, and subdivision (D) of this same section as amended in 1944.
[12] The conservation of mineral resources is not accomplished by taking these minerals from a certain class of owners who have pooled their interests to make development of the unit possible and giving them to another class. But their preservation, and the prevention of waste, is accomplished by compelling all mineral owners, of whatever class, to draw their proportionate share of these resources through the only well permitted to be drilled on the unit unless an exception is granted. It is under this premise, and to this extent alone, that the individual owners of all classes who have the right to go upon the land and reduce these resources to possession must yield to the public interest. As compensation they are guaranteed their just share of these minerals when produced will be given to them. Under the contract whereby they secure the servitude or lease, they know the land may be subject to unitization, and they will have to surrender the right to go upon the land, but they do not contemplate, nor do they intend, that such unitization will take their property from them to the unjust enrichment of another class of owners.
[13] Article 792 of the Revised Civil Code.